UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Joel A., | ) | |
| | ) | |
|    *Plaintiff*, | ) | |
| | ) | |
| v. | ) | No. 19 CV 50156 |
| | ) | Magistrate Judge Lisa A. Jensen |
| Andrew Marshall Saul, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
|    *Defendant*. | ) | |

## MEMORANDUM OPINION AND ORDER[1]

This case has a long administrative history. In 2003, Plaintiff first applied for Social Security benefits, alleging that he was disabled based on seizures caused by epilepsy, a learning disorder, and other impairments. In 2005, an administrative law judge ("ALJ") found that Plaintiff's seizures were frequent enough to satisfy Listings 11.02 and 11.03. Plaintiff received benefits for many years. Then, in late 2013, the Agency determined that Plaintiff had medically improved because his seizures were no longer frequent enough to meet the listings. This determination triggered a new round of what turned out to be a lengthy administrative process eventually leading to the most recent ALJ decision, issued in late 2018. A new ALJ found that Plaintiff had the residual functional capacity ("RFC") to do light work. In this appeal, Plaintiff's seizures have moved off-stage for the moment. Although Plaintiff still alleges that they are part of the reason he cannot work, his arguments for a remand center on his psychological impairments, specifically his concentration problem. Despite the already lengthy history of this case, the Court finds that a remand is required.

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings pursuant to 28 U.S.C. § 636(c).

## BACKGROUND

Plaintiff, now 53 years old, has suffered from seizures his entire life. According to a letter his parents submitted in 2014, the first seizure occurred when he was only four months old. R. 412. His parents believe that the seizures were caused by brain damage, although they no longer have any records from this time to provide a more detailed description. *Id*. Ever since the first seizure, Plaintiff has been on medication and under the care of a neurologist. *Id.* Although Plaintiff graduated from high school, he took special education classes and had problems paying attention and staying organized. In his young adult years, Plaintiff worked in a series of jobs— *e.g.,* cashier, furniture store worker—but was not able to stay in any one job for a long period.

After applying for benefits in 2003, Plaintiff was evaluated by a consultative psychologist and a doctor. In January 2004, psychologist John Peggau conducted IQ tests and concluded that Plaintiff had "[s]ome cognitive impairment secondary to epilepsy." R. 490. In February 2004, Dr. Stephen C. Geller interviewed and examined Plaintiff for an hour and diagnosed him with a seizure disorder. Here is Dr. Geller's conclusion:

> **Summary**. This 36 year old man has a near life-long history of epilepsy and a slightly strange affect, which is quite common with seizure patients. He has the barest hint of left-sided weakness; he really has full strength in all four extremities. Any limitations in intellectual functioning would require more specialized testing to discover.

R. 492.

In 2005, as noted above, an ALJ found Plaintiff disabled under a listing analysis. Ex. 4A. Because the ALJ found Plaintiff disabled based solely on the seizures, the ALJ did not further evaluate Plaintiff's other alleged impairments, which included a learning disorder, attention deficit disorder, and degenerative back problems.

After the Agency found that Plaintiff had medically improved, Plaintiff was re-evaluated. Two State agency doctors, one in November 2013 and the other in August 2014, concluded that Plaintiff was not disabled based on organic brain disorder. Exs. 8F, 12F. Neither doctor examined Plaintiff, nor considered his depression, which was not yet in the medical records.

In this same general timeframe, Plaintiff was treated for his seizures by Dr. Mohammed S. Afzal, a neurologist. *See* Exs. 6F, 10F.

In March 2015, Plaintiff was evaluated by clinical psychologist Glenn B. Gelman on three separate days. Dr. Gelman administered ten tests and then issued a four-page report. Ex. 14F. His diagnosis was as follows:

> **Provisional Diagnostic Impression:** The available data are consistent with DSM-5 diagnosis of 296.32 Major Depressive Disorder, Moderate, Chronic. Antisocial, paranoia, are borderline traits are also evident.

R. 581.

On August 21, 2018, the most recent administrative hearing was held. Plaintiff testified, along with a vocational expert and a medical expert.

On November 13, 2018, the ALJ issued his ruling. The Court will only discuss the portions relevant to the analysis below. At Step Two, the ALJ found that Plaintiff did not have a learning disorder or an organic mental disorder. Although Plaintiff does not directly challenge this finding, he does challenge the ALJ's rejection of Dr. Gelman's March 2015 report, which was discussed in this part of the decision. At Step Three, the ALJ analyzed the four paragraph B criteria. Relevant here are the second and third criteria. The ALJ concluded that Plaintiff had moderate limitations in both areas, explaining as follows:

> The next functional area is interacting with others. In this area, the claimant has moderate limitation. The claimant alleges difficulty getting along with his housemates and he reported a period of social isolation in 2017 and 2018 (23F). Giving the claimant every benefit, and in spite of the fact that he is consistently

3

> calm, cooperative, and in no apparent distress during his appointments, I find that the claimant's history of depression could be expected to pose moderate limitations on his ability to interact with others.
>
> The third functional area is concentrating, persisting, or maintaining pace. In this area, the claimant has moderate limitations. The claimant reports sleep deficits (23F) and he alleges that his pain and depression interfere with his ability to persist with tasks (23F). Giving the claimant every benefit, and secondary to any medication side effects or sleep deficits, I find that the claimant would be moderately limited in his ability to concentrate, persist, or to maintain pace.

R. 21-22.

In the RFC analysis, the ALJ set forth a long summary of Plaintiff's medical history, which included numerous visits to the emergency room. The ALJ then considered the medical opinions, giving no weight to the opinions of the two State agency doctors, who found Plaintiff had no severe mental impairments, because those opinions were rendered before Plaintiff's treatment for depression began. The ALJ reiterated the same basic points from the Paragraph B analysis. Here is the relevant excerpt:

> I note that the claimant has since pursued substantial treatment for depression (23F). For these reasons, I have assessed moderate limitations in his ability to interact with and relate with others and to concentrate, persist, or to maintain pace or to adapt and manage himself. I find that these moderate limitations, as documented by the claimant's therapist, would affect his ability to perform work that requires frequent communication or public contact. I also find that his history of moderate limitations in the ability to concentrate, persist, or to maintain pace secondary to his history of depression and any medication side effects would affect this ability to perform work that required more than end-of-day performance expectations. []
>
> For all the foregoing reasons, I find that . . . his history of depression requires that he perform work that involves no more than simple decisionmaking, end of day performance expectations, and no frequent communication or public contact.

R. 32-33.

## STANDARD OF REVIEW

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C.

4

§ 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Accordingly, the reviewing court is not to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Moreover, federal courts cannot build a logical bridge on behalf of the ALJ. *See Mason v. Colvin*, No. 13 C 2993, 2014 WL 5475480, at *5-7 (N.D. Ill. Oct. 29, 2014).

## DISCUSSION

Although Plaintiff raises several arguments for a remand, the most clear-cut argument—and thus the natural starting point for our analysis—is the assertion that the ALJ violated the well-recognized rule that an ALJ who finds that a claimant has a moderate limitation in concentration, persistence, and pace (hereinafter, "CPP") must then "account for" or "translate" this limitation when formulating the later RFC and when posing hypothetical questions to the vocational expert. *See, e.g.*, *Winsted v. Berryhill*, 923 F.3d 472, 476 (7th Cir. 2019) ("Again and again, we have said that when an ALJ finds there are documented limitations of concentration,

5

persistence, and pace, the hypothetical question presented to the VE must account for these limitations.") (citing to six cases to justify the "again and again" assertion). As the Seventh Circuit explained in *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010) and many subsequent cases, "employing terms like 'simple, repetitive tasks' on their own will not necessarily" address the individualized concentration problem at issue. *Id.* at 620. The Seventh Circuit stated that this principle holds in "most cases," thus allowing leeway for some limited exceptions, as discussed below. *Id.* The larger concern is that a person might have the intellectual capacity to do a particular task, but might lack the concentration to do it repeatedly "over the course of a standard eight-hour work shift." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019); *Sara G. v. Berryhill*, 18-CV-50038, 2019 WL 2085133, *2 (N.D. Ill. May 13, 2019) ("If there's one lesson to be gleaned from the *O'Connor-Spinner* line of cases, it is that the simple nature of a discrete job task has no direct connection to the ability to do that task repeatedly over long stretches of time. In fact, if anything, the more routine the task, the *harder* it is to keep focused.") (emphasis in original).

      Plaintiff argues that the ALJ did not adhere to these principles. This Court agrees. The ALJ included the following mental RFC limitations: "no more than simple decisionmaking, end of day performance expectations and no frequent communication or public contact." R. 23. This phrase has three limitations, but the middle one ("end of day performance expectations") is the main one for the CPP issue. Essentially, as construed by the parties, this limitation means that Plaintiff would *not* have to meet hourly quotas, just end-of-day quotas.

      Although the ALJ's opinion is 23 pages, much longer than the average ALJ opinion, the Court can only find a few short statements explaining why this limitation was chosen. The

6

clearest articulation of the ALJ's reasoning is the following, which is part of the longer quotation already set forth above:

> I also find that his history of moderate limitations in the ability to concentrate, persist, or to maintain pace secondary to his history of depression and any medication side effects would affect this ability to perform work that required more than end-of-day performance expectations.

R. 32-33. This explanation is inadequate for several reasons.

First, it is merely a raw conclusion. There is no analysis, no "logical bridge" from the evidence to the conclusion as required by the Seventh Circuit. *See Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). In this brief statement—and again, the Court cannot find any better explanation elsewhere in the decision—the ALJ provided no window into his decision-making. The ALJ vaguely referred to Plaintiff's "history of depression" and to "any medication side effects" and to Plaintiff's limitation in "maintain[ing] pace." But aside from these general phrases, the ALJ did not further elaborate. This vagueness makes it difficult to understand why the ALJ believed that Plaintiff's problems could be accounted for by the end-of-day provision.

In his opening brief, Plaintiff argues that he would likely be off task "for long stretches" of the workday because of his concentration problems. Plaintiff's Brief at 6, Dkt. 16. Plaintiff cites to multiple lines of evidence supporting this theory, including:

- observations by Plaintiff's therapists (Therese Jarvi and Susan Allen) that he "exhibited a disheveled appearance and a depressed mood with a flat and giggly affect as well as flight of ideas and a tangential thought process"

- observations by his parents, in the November 2014 letter, that he struggled in school "due to poor attention span, ADHD, processing difficulties in the area of writing skills, poor coordination, [and] poor organizational skills" and that he "couldn't keep a job" due to similar problems

- his testimony about medication side effects, including forgetfulness, lightheadedness, and dizziness causing him to lie down

- his statements in function reports that it took him a long time to carry out household tasks

- Dr. Gelman's testing showing that he had neurocognitive problems and difficulty completing tasks in a timely manner

Plaintiff's Brief at 5-7, Dkt. 16; R. 412. Plaintiff argues that this evidence, considered cumulatively, undermines the ALJ's assumption that he could meet the end-of-the-day quotas.

> One court described this type of limitation as a "tortoise-and-the-hare scenario," stating:
>
> [T]he ALJ is envisioning a tortoise-and-the-hare scenario in which plaintiff would be unable to keep pace consistently throughout the day but could somehow catch up later in the day. If so, there is nothing in the record to suggest that plaintiff, despite his slow processing speed, had unusual bursts of productive energy akin to a college student who pulls an all-nighter to finish a paper.

*Novak v. Berryhill*, 15-CV-50236, 2017 WL 1163733, *7 (N.D. Ill. Mar. 29, 2017). Plaintiff argues that the evidence above shows that he also did not have any "bursts of productive energy" hidden in reserve. There is no need to further assess the evidence Plaintiff has presented because the ALJ never seriously considered it when fashioning the RFC limitations. In reviewing the record, the Court cannot find any evidence suggesting that Plaintiff's concentration difficulties were short-lived or temporary in such a way that he could, like a runner with a kick at the end of race, make up for ground lost earlier in the day and still meet his co-workers at the same end-of-day finish line. In sum, the ALJ "made no effort" to "build an accurate and logical bridge" between the RFC restriction and the CPP finding. *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017).

Second, the ALJ also did not base his finding on any medical opinion. As noted above, the ALJ rejected the State agency opinions, rejected Dr. Gelman's consultative report, and failed to call an expert to testify about Plaintiff's psychological impairments. The ALJ did call an expert, but the ALJ made clear that this expert would not testify about the mental impairments. *See* R. 74 (ALJ: "I'm not going to ask you to comment on any of the mental health aspects of []

8

claimant."). The only medical statement the ALJ arguably relied on were the treatment notes from Dr. Afzal, as set forth in Exhibits 6F and 10F. However, as discussed below, these notes did not set forth any formal opinion and could not have addressed Plaintiff's depression, which had not yet arisen and which was the basis for the CPP finding. The upshot is that the ALJ engaged in a layperson analysis. *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

In its response brief, the Commissioner does not argue that the ALJ provided any additional explanation beyond the minimal one quoted above. The Commissioner's primary counter-argument is to note that the Seventh Circuit has sometimes found that the *O'Connor-Spinner* presumption can be overcome. The Commissioner relies on four cases where the Seventh Circuit has affirmed when ALJs included some variant on the simple-task restriction. *See Pytlewski v. Saul*, 791 Fed. App'x. 611 (7th Cir. 2019); *Dudley v. Berryhill*, 773 Fed. App'x. 838 (7th Cir. 2019); *Jozefyk v. Berryhill*, 923 F.3d 492 (7th Cir. 2019); *Burmester v. Berryhill*, 920 F.3d 507 (7th Cir. 2019).

The Court finds that the Commissioner's four cases are factually distinguishable because the ALJs there provided more than a conclusory layperson analysis. Instead, they relied on a doctor's assessment or the claimant's testimony explicating what the particular type of concentration problem was, which in turn allowed the ALJ and the medical expert to "tailor" or "capture" that limitation in an individualized way. In short, the analysis was more fine-grained. In *Jozefyk*, both the claimant and the state agency psychologist agreed that the claimant's concentration problems were present only "in social settings" or when he was "in a crowd." 923 F.3d at 494, 498. In *Burmester*, a medical expert specifically "translated" the CPP finding when he opined that the claimant could "understand, remember and carry out simple instructions" and

9

further stated that the claimant's CPP problem would be "manageable" in the workplace. 920 F.3d at 511. In *Dudley*, a consultative psychologist and a state agency doctor opined that, although the claimant had some difficulty focusing on detailed tasks, she still "could perform simple repetitive tasks." 773 Fed. App'x. at 839-40, 842. Finally, in *Pytlewski*, the ALJ relied on statements from a consultative psychologist and two State agency psychologists whose opinions suggested that the claimant had the "persistence to complete workdays and workweeks in performance of simple repetitive tasks." 791 Fed. App'x. at 613. In sharp contrast, the ALJ here had no such "medical translator" helping him formulate the appropriate RFC restrictions.

For these reasons, the Court finds that this issue, by itself, justifies a remand. *See, e.g.*, *Crump*, 932 F.3d at 570 (remanding under a "straightforward" analysis based on the *O'Connor-Spinner* cases). Since the case is being remanded already, the Court need not engage in a detailed analysis of all the remaining arguments. However, the Court will note additional areas of concern, some more significant than others, to help guide the ALJ and Plaintiff on remand. These concerns echo and reinforce the above conclusions.

First, the ALJ found that Plaintiff also had moderate limitations in social interaction. The same questions arise about whether and how the ALJ accounted for this limitation. It is true that the ALJ did include a limitation for "no frequent communication or public contact." R. 33. Although this restriction generally relates to social interaction, a question still exists as to why it was chosen and, more specifically, whether it went far enough. Notably, the ALJ did not include a limitation regarding interaction with co-workers or supervisors, although perhaps the "no frequent communication" limitation was meant to indirectly cover this issue. The limitation explicitly limiting interaction with co-workers and supervisors is a common one for claimants with psychological problems. It is potentially applicable here because Plaintiff and his parents

10

described ongoing difficulties Plaintiff had with work supervisors. *See* R. 389 ("I have told off more than one boss"); R. 407 ("have told bosses what I thought of them in no uncertain terms"); R. 464 (job at furniture store – "fired for wising off to boss"); R. 464 (job at gas station – "fired for wising off to boss"). The ALJ never confronted this evidence.

Second, the ALJ repeatedly mentioned and obviously put great weight on the fact that Plaintiff spent much time on the computer. R. 19 ("spends his days socializing on the computer"); R. 17 ("spent his days playing online games, using Facebook"); R. 19 ("he can . . . use a computer all day"). The ALJ seems to be suggesting that this activity requires the type of persistence needed to work steadily for eight hours at a job. But this conclusion is not obvious, nor supported by expert testimony. One could easily imagine a scenario in which the opposite conclusion could be drawn—namely, that the claimant was falling into time-sucking rabbit holes on the internet and was therefore *not* getting tasks done. *See Voight v. Colvin*, 781 F.3d 871, 878 (7th Cir. 2015) (the ALJ failed to "explain his assumption" that "playing video games online requires the same concentration as is required for full-time employment").

Third, one topic that arose in several places is Plaintiff's job taking care of his disabled fiancé. This issue was discussed in the Step One analysis and elsewhere. But the Court had difficulty following these arguments because the underlying facts about the precise nature and timing of Plaintiff's work were unclear. The ALJ characterized Plaintiff as doing fairly constant rigorous physical work whereas Plaintiff testified that his role was more limited and sporadic.

Fourth, the ALJ placed much weight on Plaintiff's ability to do household chores, both for himself and his fiancé. However, the ALJ failed to acknowledge the countervailing considerations that such tasks often can be accomplished at a pace and in a manner different than those required on a full-time job. *See Lanigan*, 865 F.3d at 564 ("Perhaps Lanigan was

11

succeeding at 'activities and interests' relevant to competitive employment, or he might have been excelling at wholly irrelevant tasks, e.g., caring for his pets or vacuuming the house.").

Fifth, Plaintiff argues that the ALJ provided insufficient reasons for rejecting Dr. Gelman's four-page report. This was one of Plaintiff's major arguments and is a larger topic that will not be fully explored here. But Plaintiff raises valid concerns both about doctor-playing and about the specific rationales the ALJ offered. One rationale was that Dr. Afzal, around this same time (*i.e.* 2013-2015), did not observe *any* abnormal or unusual symptoms or behavior. R. 19. Even though Dr. Afzal did not render any formal opinion, the ALJ essentially extracted one from his treatment notes and then used it to discount Dr. Gelman's opinion. But several questions should be considered further before relying on this conclusion. One is whether Dr. Afzal's observations were consistent with the overall record. For example, Dr. Geller, the neurologist who treated Plaintiff in 2004, noted that he had a strange effect; Dr. Peggau noted inconsistencies in Plaintiff's behavior and found that he had difficulties in certain areas. If Dr. Afzal's treatment notes were relied upon fully, the logical conclusion to be drawn from them would be that Plaintiff had no CPP limitations whatsoever. But the ALJ did not agree with this conclusion, finding that Plaintiff did have moderate problems in several areas. Another concern is that Dr. Afzal's observations were made in short office visits addressing the discrete issue of Plaintiff's seizures; he was not directly investigating the possibility of a learning disorder. *See Crump*, 932 F.3d at 571 (questioning relevance of the fact that the claimant "could pay attention in the doctor's office and thus in the context of a structured, relatively short mental health examination, [which is ] an *altogether different environment* than a full day at a competitive workplace with sustained demands") (emphasis added). The Court notes that Dr. Geller in 2004 stated that he would need more time to assess whether a learning disorder was present. *See* R.

12

492 ("Any limitations in intellectual functioning would require more specialized testing to discover."). These are all questions that an expert on remand can address more fully and authoritatively.

Sixth, the ALJ gave much credence to various statements Plaintiff made about his condition or activities. However, some evidence raises a concern about Plaintiff's insight and reliability as a historian. For example, Dr. Peggau noted that Plaintiff made claims about working numerous temporary jobs in North Carolina which "did not make sense" based on documents Dr. Peggau had reviewed. R. 487. The ALJ's own summary notes various inconsistencies. *See* R. 26 ("The claimant [reported in May 2015] that he had not had a seizure in 8.5 years. This is inconsistent with his pursuit of Emergency Room treatment in January 2015 where he reported he was experiencing frequent seizures.") (internal citations omitted). Of course, one explanation could be that Plaintiff was exaggerating or even malingering. But another possibility, one not explored by the ALJ, is that these inconsistencies were caused by, and thus evidence of, psychological or organic brain disorders. *See Lewis v. Astrue*, 10-C-6447, 2012 WL 5342669, *7 (N.D. Ill. Oct. 25, 2012) ("Federal courts have long recognized that, in the context of mental illness, insight can play an important role in evaluating the claimant's credibility; and, by definition, a claimant with poor insight cannot be expected to understand the true nature of his impairments."). The ALJ, however, took Plaintiff's statements at face value. For example, the ALJ concluded that Plaintiff had no limitation in understanding, remembering, or applying information because, among other reasons, he "refuse[d] recommended treatments." R. 21. The ALJ's statement suggests that Plaintiff was wisely declining unnecessary treatments. But the underlying source materials relied upon by the ALJ suggest a more equivocal picture in which the nurses were concerned that Plaintiff was not accurately evaluating the risks. *See* R.

13

1298 ("patient basically refuses to undergo interventional injection therapy related to inaccurate information he's heard from general public members"); R. 1321.

Seventh, the ALJ's summary of Plaintiff's counseling for depression in 2017-2018 is less thorough than the summary of other problems. Although the Commissioner lauds the length of the ALJ's overall discussion, this one issue receives much less discussion. In several instances, the ALJ simply cites to Exhibit 23F to substantiate his contentions, but this exhibit is 122 pages. Without pinpoint citations, it is difficult to follow the ALJ's path of reasoning.

Eighth, this is more of general observation. In reading the ALJ's summary of Plaintiff's medical history, the ALJ noted that Plaintiff went to the emergency room numerous times. In this Court's experience, ALJs often draw negative inferences when claimants have *not* gone to the emergency room. Here, the shoe is on the other foot. But the ALJ did not discuss this line of evidence in the analysis portion of the decision. Perhaps there is a good reason why these visits were not probative on any issue, but the ALJ should explain why this is so.

Ninth and finally, the ALJ did not allow Plaintiff's sister to testify. After Plaintiff finished testifying, his counsel stated that he would like to call Plaintiff's sister to testify about Plaintiff's "concentration and cognitive issues." R. 68. The sister was a school teacher who supposedly knew "a lot about [Plaintiff's] personal issues." R. 69. Counsel wanted her to testify with Plaintiff not in the room. But the ALJ refused, stating that he knew "where this testimony was headed," which was that the sister was "going to basically back up [Plaintiff's] story." *Id.* The ALJ stated, however, that Plaintiff could submit a written statement from his sister after the hearing. Insofar as this Court can determine, counsel never submitted a letter. It is not clear why, and Plaintiff did not raise the ALJ's refusal to let his sister testify as an argument here. But the sister's testimony would have addressed the concentration issue now at the heart of this appeal.

14

Sure, it is possible, as the ALJ was predicting, that this testimony would have simply "backed up" Plaintiff's story. But even so, this could have helped Plaintiff's case given that the ALJ did not find his testimony credible and also given the concerns noted previously about whether Plaintiff fully understood his own limitations.

In remanding this case, the Court is not indicating that all these additional issues must be resolved in a particular way or that they will all turn out to be material, but rather that they should be explored more thoroughly. Although the main reason for remanding this case is the relatively narrow CPP issue, the ALJ on remand should re-visit all these issues with a fresh eye and should, with the help of an appropriate medical expert, consider the cumulative effect of all the alleged impairments and limitations.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is granted, the Commissioner's motion is denied, and this case is reversed and remanded for further consideration.

Date: October 15, 2020　　　　　　　　　　By: _____
　　　　　　　　　　　　　　　　　　　　　　　Lisa A. Jensen
　　　　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge

15